IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


ALEX E. BRAND

                Plaintiff,

                                          No. 03:10-CV-189-HZ

                                          OPINION & ORDER

    v.

KAREN C. ANGUS, et al.,

                Defendants.


J. Clay McCaslin
LAW OFFICE OF J. C. MCCASLIN
510 SW 5th Ave. Ste. 500
Portland, OR 97204

        Attorney for Plaintiff

Kevin C. Danielson
US ATTORNEY'S OFFICE
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204

        Attorney for Defendants

HERNANDEZ, District Judge:

Plaintiff Alex E. Brand ("Plaintiff" or "Brand") brings a <u>Bivens</u> action alleging three claims for violations of his rights under the Eighth Amendment.[1]  Now before me is a motion to dismiss (doc. #45) for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule") and a motion for summary judgment (doc. #45) under Rule 56 filed by defendants Karen Angus ("Angus"), Jaspal Dhaliwal ("Dhaliwal"), Roger Heintz ("Heintz"), and Jeffrey Pecyna ("Pecyna") (collectively, "Defendants").[2]  Also before me is a motion to strike (doc. #73) the declaration of David Childress ("Childress Declaration") and Exhibit 1 attached to the Childress Declaration filed by plaintiff Alex E. Brand ("Plaintiff" or "Brand").

For the reasons that follow, Defendants' motions to dismiss (doc. #45) is GRANTED and Defendants' motion for summary judgment (doc. #45) is GRANTED.  I do not consider the Childress Declaration or Exhibit 1 attached to the declaration and therefore, Plaintiff's motion to strike (doc. #73) is DENIED as moot.

## BACKGROUND

Plaintiff was an inmate at Sheridan Federal Correctional Institution ("Sheridan FCI") from December 27, 2007, through September 23, 2008.  On February 21, 2008, Plaintiff was working at his assigned job in a boiler room located at the "powerhouse" when he was burned over a portion of his body by hot water while attempting to change a hot water filter.[3]

/ / /

---

[1] The seminal case <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) provides for private rights of action against federal actors for violations under the Eighth Amendment.

[2] Plaintiff dismissed his claims against defendants Sean F. Price, Jeffrey E. Thomas, Charles A. Daniels, Linda E. Cobb, and Dawn Lee Dannelley.  <u>See</u> Resp., p. 1, n.1.  Accordingly, any arguments concerning these defendants will not be addressed.

[3] The purpose of the hot water filter was to remove rust and other impurities from the water circulating through the hot water boilers.

## STANDARDS

### I. Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 663 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). The allegations made in a complaint must be both "sufficiently detailed to give fair notice to the opposing party of the nature of the claim so that the party may effectively defend against it" and "sufficiently plausible" such that "it is not unfair to require the opposing party to be subjected to the expense of discovery." Starr v. Baca, 633 F.3d 1191, 1204 (9th Cir. 2011).

### II. Motion for Summary Judgment

Summary judgment is proper if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. See Rule 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. E.g., Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  The moving party need only demonstrate that there is an absence of evidence to support the non-moving party's case.  <u>Celotex Corp.</u>, 477 U.S. at 325.  The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial.  <u>Id.</u> at 324.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 248 (quotation omitted).  The non-moving party must come forward with more than "the mere existence of a scintilla of evidence." <u>Id.</u> at 252.  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." <u>Id.</u>  However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. <u>See</u> <u>Thornhill Publ'n Co., Inc. v. GTE Corp.</u>, 594 F.2d 730, 738 (9th Cir. 1979).  Lastly, "in ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999) (quoting <u>Anderson</u>, 477 U.S. at 255).

## DISCUSSION

## I. Applicable Legal Standards

### A. Eighth Amendment

The United States Supreme Court has previously explained:

The [Eighth] Amendment . . . imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that

inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]

Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal citations and quotations omitted).

"The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health'". Id. at 828; see also Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (the standard for finding that medical care is insufficient and thus violates the Eighth Amendment is "deliberate indifference"). "[T]he Eighth Amendment is implicated in the prison work context only when a prisoner employee alleges that a prison official compelled him to "perform physical labor which [was] beyond [his] strength, endanger[ed his life] or health, or cause[d] undue pain." Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (quotations and citations omitted). "[A] prison official violates the Eighth Amendment only when two requirements are met." Farmer, 511 U.S. at 834. That is, an Eighth Amendment claim must satisfy an objective element and a subjective element. Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000). The objective element of the Eighth Amendment inquiry seeks to determine whether the deprivation was "sufficiently serious." Wilson v. Seiter, 501 U.S. 294, 298 (1991); see also Farmer, 511 U.S. at 828 ("First, the deprivation alleged must be, objectively, sufficiently serious[.]") (Citations and quotation marks omitted). The second element requires plaintiff to "make a subjective showing that the prison official acted with a sufficiently culpable state of mind." Urrizaga v. Twin Falls Cnty., 106 Fed. Appx. 546, 548 (9th Cir. 2004) (citing Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000)). "The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." Farmer, 511 U.S. at 828 (citations and quotations omitted). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless

the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id., at 837.

"Deliberate indifference is a high legal standard." Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1019 (9th Cir. 2010). Deliberate indifference "describes a state of mind more blameworthy than negligence" and "requires more than ordinary lack of due care for the prisoner's interests or safety." Farmer, 511 U.S. at 835 (citations and quotation marks omitted). "[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." Id. at 836. "[T]o act recklessly in either setting a person must consciously disregar[d] a substantial risk of serious harm." Id. at 839 (citation and quotation marks omitted).

"[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Estelle, 429 U.S. at 105-06 (citations and quotation marks omitted). "[M]ere allegations of malpractice do not state a claim" under the Eighth Amendment. Id. at 106, n.14. "[A] plaintiff's showing of nothing more than 'a difference of medical opinion' as to the need to pursue one course of treatment over another [i]s insufficient, as a matter of law, to establish deliberate indifference." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1995) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)). In addition, a prisoner has "no claim for deliberate medical indifference unless the denial was harmful." Shapely v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

## B. Qualified Immunity

Defendants raise the affirmative defense of qualified immunity.  The United States

Supreme Court has described the qualified immunity doctrine as follows:

> The doctrine of qualified immunity protects government officials from liability
> for civil damages insofar as their conduct does not violate clearly established
> statutory or constitutional rights of which a reasonable person would have known.
> Qualified immunity balances two important interests–the need to hold public
> officials accountable when they exercise power irresponsibly and the need to
> shield officials from harassment, distraction, and liability when they perform their
> duties reasonably.  The protection of qualified immunity applies regardless of
> whether the government official's error is a mistake of law, a mistake of fact, or a
> mistake based on mixed questions of law and fact.

Pearson v. Callahan, 555 U.S. 223, (2009) (citations, internal quotation marks omitted).

The analysis of whether a government official is entitled to qualified immunity "requires

two steps."  Gonzalez v. Las Vegas Metro. Police Dep't, 445 Fed. Appx. 961, 962 (9th Cir.

2011).  "First, a court must decide whether the facts that a plaintiff has alleged or shown make

out a violation of a constitutional right."  Pearson, 555 S. Ct. at 815-16 (internal citations

omitted).  Second, "the court must decide whether the right at issue was 'clearly established' at

the time of defendant's alleged misconduct."  Id. at 816.  Following Pearson, courts are

"permitted to exercise their sound discretion in deciding which of the two prongs of the qualified

immunity analysis should be addressed first in light of the circumstances in the particular case at

hand."  Id.  at 818.

## II. First Claim for Relief

Plaintiff's First Claim for Relief alleges violations by Pecyna and Angus for unsafe and

inhumane conditions of confinement, failure to train, failure to supervise, and failure to warn.

/ / /

/ / /

**A. Pecyna**

It is undisputed that at the time of Plaintiff's injury, Pecyna was the detail supervisor at the powerhouse at Sheridan FCI.  Pecyna Decl., ¶ 5.  Plaintiff asserts there is a triable issue of fact as to whether Pecyna demonstrated a conscious disregard of a substantial and known risk to his safety by failing to follow official policies regarding safety training and supervision, the issuance of personal protective equipment ("PPE"), and lockout/tagout devices.  Defendants contend there is no evidence showing Pecyna was aware of a substantial risk of harm to Plaintiff.

**1. Failure to Train and Supervise**

Defendants assert Pecyna believed Plaintiff was properly trained and supervised.  Defendants present evidence showing that although Pecyna does not remember training Plaintiff with regard to how to change the hot water filter, he believes that he did in fact train Plaintiff.  Pecyna Decl., ¶¶ 14-15.  Defendants argue Pecyna's belief that he had trained Plaintiff to safely replace the hot water filter is evidenced by the fact that Plaintiff admitted he knew how to change the hot water filter and that other inmates state that Plaintiff told them that he knew how to change the hot water filter.  The portion of the record on which Defendants rely shows Plaintiff told Susanne Turner, the safety specialist who investigated the accident, that "me [sic] and the other guys have [cleaned the filter].  Isn't it when you twist the filter cap out and spray the filter with the hose."  Crummel Decl., Ex. 1, p. 41.  In addition, Defendants proffer statements from two inmates, John McBenge and Keith Huling, who both stated Plaintiff told them that he knew how to change the hot water filter.  Id., pp. 41, 42, 45.

Plaintiff argues there is no evidence showing Pecyna actually trained Plaintiff.  In support of his proposition, Plaintiff offers evidence showing that on a form titled "Initial Job Orientation" dated January 29, 2008, he was required to receive "initial job training by his

supervisor concerning safe work methods".  Pecyna Decl., ¶ 23; Id., Ex. 1, p. 3.  Plaintiff asserts

that although the term "HW/CW Sidestream Filters"[4] is typed on the Initial Job Orientation form,

neither Plaintiff nor Pecyna initialed, signed, or dated the document.  Id., ¶ 23; Id., Ex. 1, pp. 1-3.

Plaintiff also argues there is a triable issue of fact as to whether Pecyna failed to supervise

Plaintiff, proffering as evidence Pecyna's statement that Plaintiff "wasn't quite to the point yet

where he could safely perform all of his job functions without supervision" and that "if he had

more supervision that would have possibly prevented his injury from occurring".  McCaslin

Decl., Ex. 2, pp. 136-37.

Plaintiff's arguments are unavailing.  Although the facts proffered by Plaintiff may

suggest Pecyna acted negligently by failing to properly train or supervise Plaintiff, such facts do

not rise to the level of constitutional significance as required under the Eighth Amendment.

Even assuming Pecyna inadequately trained and supervised Plaintiff, there is simply no evidence

creating a triable issue of fact that Pecyna was aware of facts from which he could have inferred

that a substantial risk of serious harm existed and that Pecyna in fact drew the inference.  See

Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995) (an inmate must show that the "official

knew of the risk and that the official inferred that substantial harm might result from the risk")

(citation omitted).

### 2. Lockout/Tagout Device and Personal Protective Equipment

Defendants argue there is no genuine issue of material fact as to whether Pecyna

subjectively believed that a substantial risk of serious harm existed when he asked Plaintiff to

change the hot water filter or whether Pecyna believed the hot water filter needed a

lockout/tagout device.  In support of their arguments, Defendants offer as evidence that from

2005–when the filter was first installed in the powerhouse–until Plaintiff's injury in February

---

[4] "HW/CW" stands for "hotwater/coldwater."  Pecyna Decl., ¶ 24.

2008, the hot water filter had been changed by inmates approximately 2,000 times "without an inmate being burned or injured."  Pecyna Decl., ¶ 21.  Defendants also offer evidence showing Pecyna was "not aware of any [Bureau of Prisons ("BOP")] employee who worked at the powerhouse or who worked in the safety department ever suggesting placing a lockout/tagout device on the hot water filter system to prevent someone from getting burned."  Pecyna Decl., ¶ 20.

Plaintiff argues there is a triable issue of fact as to whether Pecyna's failure to adhere to lockout/tagout "procedures" in the boiler room constituted a deliberate indifference to his physical safety.  Plaintiff proffers evidence showing that after he was injured, a Hot Water Filter Vessel Work Place Accident Investigation Report (the "Safety Report") was issued stating, "The root cause of the accident appears to be due to lockout/tagout procedures not being adhered to and the inmate not being properly trained on this specific piece of equipment.  The inmate job orientation does not indicate that the inmate was trained on this piece of equipment."  Crummel Decl., Ex. 1, p. 5.  Plaintiff also argues the lockout/tagout is a mandatory procedure that Pecyna was required to follow pursuant to the BOP's own written policies as set forth in a document entitled "Control of Hazardous Energy Lockout/Tagout Program".  Pecyna Decl., ¶ 19.  The Control of Hazardous Energy Lockout/Tagout Program states, in relevant part, "It is the plan of [Sheridan FCI] to ensure the protection of staff and inmate life and health through the implementation of work environment control measures."  Id.; Id., Ex. 2, p. 2.  Plaintiff contends it was Pecyna's responsibility to implement lockout/tagout "procedure" on the equipment in the boiler room instead of waiting for direction or orders from "higher-ranking officials", including the Safety Manager and the Facilities Department, citing Pecyna's deposition statement that he was "[a]uthorized to perform lockout and tagout".  McCaslin Decl., Ex. 2, p. 127.

Plaintiff also argues that Pecyna's contention that it never occurred to Pecyna that the hot water filter needed a lockout/tagout "device" belies the record.  In support of his argument, Plaintiff proffers as evidence a document attached to the "Inmate Position Description and Standards" stating, "H/W filters will be cleaned safely every night, ensuring proper LOTO (Lockout/Tagout) is followed, no exception."  Id., Ex. 3, p. 2.  In addition, Plaintiff offers evidence that other documents issued by the BOP, specifically the Control of Hazardous Energy Lockout/Tagout Program and Initial Job Orientation, discuss the "requirements and importance of the lockout/tagout program".  Resp., p. 20.  Finally, Plaintiff highlights a portion of Plaintiff's deposition testimony for the proposition that Pecyna was "aware of the significance, purpose, scope, and application of the lockout/tagout procedures" where he stated that "[i]f the Lockout/Tagout procedure had been used on the night that [Plaintiff] was injured, . . . it would have been prevented him from being injured".  Resp., pp. 25-26; McCaslin Decl., Ex. 2, pp. 132-33.

Plaintiff's arguments fail.  The parties do not dispute, and the record clearly shows, that at the time of Plaintiff's accident there was no lockout/tagout device on the hot water filter system, and therefore nothing to which the lockout/tagout procedures could apply.  See Pecyna Decl., ¶ 20.  Merely because there were policies or documents generally addressing lockout/tagout procedures does not create a triable issue of fact that Pecyna was deliberately indifferent to Plaintiff's safety.  In addition, Plaintiff's reliance on the "root cause" findings in the Safety Report issued after Plaintiff's accident is misplaced.  The findings in the report were not available to Pecyna until after Plaintiff had already been injured and therefore, do not go to Pecyna's state of mind at the time of the accident.  Notably, Plaintiff presents no evidence showing Pecyna knew of any long-standing substandard conditions associated with the hot water

filter or even knew of any prior accidents related to the hot water filter.  In fact, Pecyna stated he "did not believe [the hot water filter system] needed a lockout/tagout device" because "inmates had safely changed the hot water filter more than 2,000 times without anyone being injured". Pecyna Decl., ¶ 21.  Finally, Plaintiff presents no evidence showing Pecyna received any complaints from other employees or any inmate, including Plaintiff, concerning any danger the hot water filter posed.   When viewing the evidence in the light most favorable to Plaintiff, there is simply no triable issue of fact that Pecyna acted with deliberate indifference under the circumstances here.

### 3. Failure to Provide PPE

Plaintiff contends that because Pecyna was aware of the importance and purpose of BOP's policies regarding PPE and failed to issue any PPE, Pecyna violated his Eighth Amendment rights.  In support of his argument, Plaintiff cites a provision in the "General Shop Safety Rules" which states that "[t]o protect against physical injury and/or health hazard, each inmate worker is required to use all safety equipment provided."  McCaslin Decl., Ex. 4, ¶ 5. Plaintiff also cites a portion of Plaintiff's Initial Job Orientation which states that "[w]orkers will be trained to recognize the hazards involved in the work place, to understand the protective devices and clothing that is provided and, to report any deficiencies to their supervisor."  Pecyna Decl., Ex. 1, p. 2.  Plaintiff also cites the document attached to the Inmate Position Description and Standards stating that "[i]nmates will be given proper PPE to perform [their responsibilities associated with the boilers and piping], and other duties assigned by the shift operator."  Finally, Plaintiff cites Pecyna's own statements that inmates "should wear protective gear", that Pecyna did not see whether Plaintiff was wearing any PPE when he went to change the hot water filter, that Pecyna did not ask Plaintiff "whether he had the appropriate gear to wear", that Pecyna did

not "know what [Plaintiff had] grabbed" when he went to change the hot water filter, and that Pecyna was aware no protective apron was available to Plaintiff when changing the hot water filter. McCaslin Decl., Ex. 2, pp. 114, 117, 119.

Plaintiff's arguments again miss the mark. The evidence proffered by Plaintiff does not show that Pecyna knew or was aware that the hot water filter without a lockout/tagout device was a substantial risk to Plaintiff's safety or that the PPE provided to inmates working on the hot water filter posed a substantial risk to inmates and inferred that substantial harm might result from the risk at the time of Plaintiff's accident. See Wallis, 70 F.3d at 1077 (plaintiff must show defendant "knew of the risk and that . . . [he] inferred that substantial harm might result from the risk"). The fact that Pecyna was aware of the importance and purpose of PPE generally and knew that inmates in general "should wear protective gear", does not create a triable issue of facts that Pecyna was deliberately indifferent to Plaintiff's safety. See Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) ("Not every injury that a prisoner sustains while in prison represents a constitutional violation."). Indeed, Plaintiff fails to show what PPE inmates were required to wear when changing the hot water filter before Plaintiff's accident or that Pecyna was even aware that the PPE at the time of Plaintiff's accident was in any way inadequate, let alone posed a substantial risk to inmates. In fact, the record shows that before Plaintiff's injury, protective aprons were not provided to inmates changing the hot water filters, and were only provided to inmates working in the "chemical cage" to prevent "chemical burns". McCaslin Decl., Ex. 2, p. 116. Finally, while Pecyna's failure to verify whether Plaintiff was wearing any PPE at the time of the accident and did not know or ask Plaintiff whether he had the appropriate gear to wear may amount to negligence, such actions do not rise to the level of deliberate indifference as required under the Eighth Amendment.

In sum, viewing the evidence in the aggregate and in the light most favorable to Plaintiff–including evidence related to lockout/tagout procedures, Plaintiff's training, Pecyna's supervision, and the PPE provided to Plaintiff–I conclude there is no genuine issue of material fact demonstrating a conscious disregard of an excessive risk to Plaintiff's safety. Accordingly, Pecyna is entitled to summary judgment on Plaintiff's First Claim for Relief.

**B. Angus**

Angus was a Unit Manager at Sheridan FCI who directed and managed a housing unit and was responsible for the "total administration" of the unit "as well as the planning, development and implementation of individual programs tailored to meet the particular needs of the inmates in the unit." Angus Decl., ¶ 5. Defendants contend Angus should be granted qualified immunity because there is no evidence that Angus was aware of a substantial risk of harm to Plaintiff and disregarded that risk. Defendants argue Angus had no responsibility over Plaintiff's training at the powerhouse, had no responsibility to make sure that emergency first-aid equipment was available in the powerhouse, and believed inmates at the powerhouse were being safely trained to do their work. Defendants proffer evidence showing that prior to Plaintiff's injury, Angus was "not aware of any inmates being injured at the powerhouse where [Plaintiff] worked" and "believed that inmates working at the powerhouse were being properly trained in how to safely do the work assigned to them." Id., ¶¶ 21-22. Defendants also proffer evidence showing Angus "had no direct responsibility for the training and supervision of [Plaintiff] while he was working at the powerhouse . . . [and] had no responsibility to provide any emergency medical equipment or supplies at the powerhouse." Id., ¶ 23. Finally, Defendants provide evidence showing that before Plaintiff's accident Angus had never been inside the boiler room of the powerhouse, had no knowledge of whether inmates working at the powerhouse received any

PPE for their job assignments, and "ha[d] no idea" whether the "lockout/tagout procedure" was used in the boiler room at the time Plaintiff was injured.  McCaslin Decl., Ex. 16, pp. 57-60, 73-74.

Plaintiff asserts there is a genuine issue of material fact as to whether Angus was deliberately indifferent to his right to safe working conditions.  Plaintiff proffers evidence showing that as a Unit Manager, Angus was the "first-line supervisor" directly responsible for supervising staff, which included correctional treatment specialists, correctional counselors, and unit secretaries.  Angus Decl., ¶ 5.  Plaintiff also proffers evidence showing Angus's job description as Unit Manager states Angus was "responsible for managing virtually all aspects of the lives of inmates assigned to . . . her unit" and had "total responsibility" for the development, implementation, and evaluation of all operations within the unit including . . . security . . . [and] safety . . . procedures . . . ."  McCalsin Decl., Ex. 15, pp. 2, 6.  In addition, Plaintiff offers evidence showing Angus had "direct supervision" over him and was therefore responsible for Plaintiff's "overall" well-being and safety while he was under her supervision.  Id., Ex. 16, p. 5.  Plaintiff contends Angus did not consult with the powerhouse staff at any time to talk about Plaintiff or to determine whether he was receiving sufficient job training.  Id., pp. 4, 6, 8.  Finally, Plaintiff offers evidence showing that although Angus was aware that the purpose of supplying inmates with PPE was to keep them safe and to prevent injury, she never spoke to anyone at the powerhouse, including inmates, as to whether PPE was actually being used.  Id., pp. 9-10.

The facts proffered by Plaintiff are simply insufficient to create a triable issue of fact that Angus was deliberately indifferent.  See Toguchi, 391 F.3d at 1057 ("If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth

Amendment, no matter how severe the risk.") (Citation and quotation marks omitted).  Nothing in the record before me indicates Angus was aware of any particular risk or danger at the powerhouse.  Indeed, as Plaintiff himself readily concedes, Angus did not speak to Plaintiff or anyone else at the powerhouse about any danger associated with Plaintiff's job responsibilities as they related to his work with the hot water filter or PPE.  Simply stated, there is no genuine issue of material fact as to whether Angus acted with deliberate indifference to Plaintiff's safety. Angus is therefore entitled to summary judgment on Plaintiff's First Claim for Relief.

## II. Second Claim for Relief

Plaintiff's Second Claim for Relief alleges delay and denial of essential medical care by Jaspal Dhaliwal, M.D., and Roger Heintz, PA-C ("Heintz").  Based on the reasons below, Defendants' motion for summary judgment against Plaintiff's Second Claim for Relief is granted.

### A. Dr. Dhaliwal

Dr. Dhaliwal is a Medical Officer at Sheridan FCI who became Plaintiff's primary care physician after Plaintiff was released from Legacy Health System ("Legacy") on March 26, 2008.  McCaslin Decl., Ex. 8, p. 24.  Upon Plaintiff's release from Legacy, Dr. Dhaliwal was provided with Plaintiff's Adult Inpatient Discharge Instruction Sheet ("Discharge Instructions") which set forth Plaintiff's treatment plan by a treating physician at Legacy.  Among other things, the Discharge Instructions stated Plaintiff was to be "wean[ed] off narcotics" by receiving two "5/500" doses of Vicodin three times per day for one week, followed by one "5/500" dose of Vicodin three times per day for one week.[5]  Id., Ex. 7, p. 1; Id., Ex. 8, p. 61; Id., Ex. 9, p. 53. Despite the Discharge Instructions, the record shows Dr. Dhaliwal reduced the frequency of

---

[5] A "5/500" dose of Vicodine consists of 5 mg of Hydrocodone and 500 mg of Tylenol. McCaslin Decl., Ex. 10, p. 30.

Plaintiff's pain medications to two tablets of Percocet (5/325 mg doses) twice a day for one week, followed by one tablet of Percocet (5/325 mg dose) twice a day for one week, followed by one tablet of Percocet (5/325 mg dose) once a day for one week.  Id., Ex. 8, pp. 69-70.  The record also shows that on March 31, 2008, Dr. Dhaliwal issued a verbal prescription further reducing the frequency of Plaintiff's dosage of Percocet to one tablet twice a day for the next three days, followed by a total discontinuation of Plaintiff's pain medication.  Id., Ex. 9, pp. 75-76.

Plaintiff contends Dr. Dhaliwal improperly deviated from Plaintiff's Discharge Instructions by unilaterally reducing the frequency of his pain medication, substituting Percocet for Vicodin, and reducing his taper plan further on March 31, 2008.  Defendants contend that Dr. Dhaliwal's substitution of Percoset in this instance was not improper because the BOP does not carry Vicodin, Sheridan FCI only has a "pill line" twice a day, and Dr. Dhaliwal believed the changes made to Plaintiff's medication regimen was appropriate based on his own examination of Plaintiff.  Am. Dhaliwal Decl., ¶ 5; see also McCaslin Decl., Ex. 9, pp. 62, 71.

I am not persuaded by Plaintiff's arguments.  In a sworn declaration, Dr. Dhaliwal states Vicodin is not in the BOP Pharmacology formulary, and that in accordance with the BOP formulary, he substituted Percoset for Vicodin.  Am. Dhaliwal Decl., ¶ 5.  Dr. Dhaliwal further states that Percoset was an "appropriate and acceptable" substitute for Vicodin in this instance "[g]iven the fact that [Plaintiff] had received Percoset while hospitalized . . . without any apparent adverse effects".  Id.  In addition, Dr. Dhaliwal states that although Plaintiff alleges his dosage was lowered, causing him to suffer symptoms of withdrawal, "325 mg of Percoset is a standard dose of Percoset" and is "comparable in effect to the standard dose of 500 mg of Vicodin."  Id.

17 - OPINION & ORDER

Plaintiff proffers no evidence showing that Dr. Dhaliwal's substitution of Percoset or change to his dosage amount was neither medically equivalent nor similar in efficacy in weaning Plaintiff off of narcotics or addressing Plaintiff's pain symptoms.  Although Plaintiff makes much of the fact that Dr. Dhaliwal did not consult with doctors at Legacy or review all of Plaintiff's medical records before changing Plaintiff's prescription regimen, such facts do not demonstrate Dr. Dhaliwal's decision here was medically unacceptable.  Even if I were to assume that Plaintiff was suffering withdrawals and pain as a result of the changes to his Discharge Instructions, Plaintiff proffers no evidence showing that Dr. Dhaliwal was aware of Plaintiff's alleged withdrawals or pain caused by the change in Plaintiff's prescription regimen, let alone that Dr. Dhaliwal knew of and disregarded an excessive risk to Plaintiff's health and safety.  In fact, the record shows Dr. Dhaliwal testified that he believed the changes he made to Plaintiff's prescription regimen were appropriate based on his own examination of Plaintiff and reduced Plaintiff's prescription further on March 31, 2008, based on his consultations with Heintz. McCalsin Decl., Ex. 9, pp. 71, 77; Am. Dhaliwal Decl., ¶ 5.  The evidence before me, at most, shows Plaintiff simply disagrees with Dr. Dhaliwal's course of treatment, which falls short of creating a triable issue of fact that Dr. Dhaliwal acted with deliberate indifference.  See Toguchi, 391 F.3d at 1058 ("[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'").

Plaintiff relies heavily on Chess v. Dovey, No. CIV S-07-1767 LKK DAD P, 2011 WL 567375, at *21 (E.D. Cal. 2011) for the proposition that Dr. Dhaliwal's deviation from the Discharge Instructions constituted deliberate indifference to his to serious medical needs.  I am

not persuaded by <u>Chess</u>.  In that case, the doctor "ignored plaintiff's complaint about the ineffective nature of the Tylenol, aspirin and other medications he was being given and the pain being suffered as a result."  <u>Chess</u>, No. CIV S-07-1767 LKK DAD P., 2011 WL 567375, at *21. Here, even assuming as true that Plaintiff suffered withdrawals or pain arising out of the changes made to his prescription regimen, Plaintiff proffers no evidence establishing that he told Dr. Dhaliwal he was experiencing withdrawal symptoms, let alone that he told Dr. Dhaliwal about the specific symptoms he was experiencing or that Dr. Dhaliwal was aware the changes he made to Plaintiff's prescription were ineffective or otherwise knew that Plaintiff was suffering withdrawals and pain.  <u>See</u> Brand Decl., ¶ 17.

Other cases cited by Plaintiff are equally unpersuasive.  In <u>Franklin v. Dudley</u>, No. 2:07-cv-2259 FCD KJN P, 2010 WL 5477693, at *6 (E.D. Cal. 2010), the court held that defendant was not entitled to qualified immunity where "the record demonstrate[d] that the drugs offered by defendant . . . in the alternative had not been effective in treating plaintiff's pain in the past." In contrast to <u>Franklin</u>, here there is no evidence showing the drugs offered by Dr. Dhaliwal, including Percocet, had been ineffective in treating Plaintiff's withdrawal symptoms in the past or that Dr. Dhaliwal otherwise knew Plaintiff's course of treatment was ineffective.  Similarly, in <u>Strain v. Sandham</u>, No. CIV S-05-0474 GEB GGH P., 2009 WL 172898, at *6 (E.D. Cal. 2009), the court found there was a genuine issue of fact that defendants acted with deliberate indifference where defendants decided "not to provide methadone and remove[d] plaintiff from the medication, 'cold turkey,' after plaintiff was treated with methadone for several years by prison doctors".  In contrast to <u>Strain</u>, Plaintiff presents no evidence showing Plaintiff was treated with Vicodin "for several years" and removed from Vicodin "cold turkey".  In addition, in <u>Strain</u>, CIV S-05-0474 GEB GGH P., 2009 WL 172898, at *7 the inmate's removal from

methadone resulted in his admittance to the emergency room and required the use of morphine to treat his "excessive vomiting that injured his esophagusal".  Clearly, the facts in <u>Strain</u> are not present here.

Finally, Plaintiff presents evidence indicating that Plaintiff may not have received his evening doses of pain medication on March 26, 2008, and April 1, 2008.  McCaslin Decl., Ex. 9, pp. 90-95.  Plaintiff, however, cites no evidence showing that Dr. Dhaliwal was responsible for or was involved with Plaintiff's alleged failure to receive pain medications on these two occasions, or even knew Plaintiff did not receive his pain medication on March 26, 2008, and April 1, 2008.

In sum, when viewing the evidence in a light most favorable to Plaintiff, there is no triable issue of fact that Dr. Dhaliwal's actions constituted a conscious disregard of an excessive risk to Plaintiff's health.  Rather, the evidence simply shows Dr. Dhaliwal was following a course of treatment that he considered to be effective under the circumstances.  Defendants' motion for summary judgment regarding Plaintiff's Second Claim for Relief against Dr. Dhaliwal is granted.

### B. Heintz

Plaintiff contends there is a genuine issue of material fact that Heintz's actions constituted a deliberate indifference to Plaintiff's medical needs.  Plaintiff asserts Heintz violated his Eighth Amendment rights by recommending to Dr. Dhaliwal that his pain medication be reduced, by having him wait for hours before changing his dressings, by failing to provide him with a sterile environment to change his dressings, and by failing to timely provide him with bicycle shorts to hold his dressings in place.

With respect to Heintz's recommendation to Dr. Dhaliwal that Plaintiff's Percocet dosage be reduced to once per day, Plaintiff offers his own declaration statements that "[s]tarting [his] first day back at Sheridan FCI, [he] began to experience severe medication withdrawal symptoms, including severe anxiety, insomnia, sweaty palms, cold sweats, headache, and extreme nausea."  Brand Decl., ¶ 17.  Plaintiff also proffers his declaration statements that he told "Heintz and other members of the medical staff who administered the medications" that he was experiencing "withdrawal symptoms", that his "withdrawal symptoms were unbearable and that [he] could not sleep at night", and that he was not receiving the "correct doses".  Id.  In addition, Plaintiff offers statements by Jon Baer ("Baer"), another inmate at Sheridan FCI at the time, that Baer heard Plaintiff tell Heintz he was in pain and was suffering from withdrawals and that Heintz responded by saying "something . . . along the lines of, 'Welcome to prison' and 'You're an inmate, you don't have any rights,' and 'You're not getting any pain medications here . . . .'"  Baer Decl., ¶ 7.

The evidence proffered by Plaintiff simply does not create a triable issue of fact that Heintz was deliberately indifferent to Plaintiff's serious medical needs.  Even assuming that Plaintiff was experiencing "severe anxiety, insomnia, sweaty palms, cold sweats, headache, and extreme nausea", Plaintiff proffers no evidence demonstrating he told Heintz anything more than his general statements that he was "experiencing withdrawal symptoms", that his "withdrawal symptoms" were "unbearable", and that he was not receiving the "right dose".  Brand Decl., ¶ 17.  Plaintiff offers no evidence showing Heintz was aware of the specific symptoms Plaintiff was experiencing, including "severe anxiety, insomnia, sweaty palms, cold sweats, headache, and extreme nausea".  Id.  Simply put, there is no genuine issue of material fact that Heintz acted with deliberate indifference based on Plaintiff's general statements to Heintz and the lack of

evidence demonstrating Heintz was aware of the specific symptoms Plaintiff was experiencing. See Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (For a prison official to act with deliberate indifference, "the prison official must not only be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, but that person must also draw the inference.") (Quotation marks and citation omitted).  At best, the evidence proffered by Plaintiff simply shows Plaintiff disagrees with Heintz's medical recommendation to Dr. Dhaliwal, which without more, cannot establish a triable issue of fact of deliberate indifference. See Sanchez, 891 F.2d at 242 ("A difference of opinion does not amount to a deliberate indifference to [plaintiff's] serious medical needs.") (Citations omitted).

I also conclude that Plaintiff fails to create a genuine issue of material fact as to whether Heintz was deliberately indifferent to Plaintiff's serious medical need by having him wait for a number of hours before changing his dressings, failing to provide him with a sterile environment, and failing to provide him bicycle shorts to hold his dressings in place.[6]  Here, Plaintiff fails to elicit any evidence demonstrating that Heintz's alleged delay, failure to provide a sterile environment, and failure to timely provide him bike shorts caused him any harm.  Accordingly, Defendants' motion for summary judgment against these allegations is granted.  See Wood v. Housewright, 900 F.2d 1332, 1334-35 (9th Cir. 1999) (delay in treatment does not constitute an Eighth Amendment violation unless the delay caused substantial harm); see also Brigaerts v. Cardoza, 28 F.3d 105 (9th Cir. 1994) ("To prevail on a claim of medical indifference, a prisoner must show that the denial of adequate medical care caused him harm.") (Citation omitted).

---

[6] The Discharge Instructions stated Plaintiff "[n]eeds to wear bike shorts for support & hold dressings in place."  McCaslin Decl., Ex. 7, p.1.

In sum, Plaintiff fails to create a triable issue of fact that Dr. Dhaliwal and Heintz were deliberately indifferent to his serious medical need.  Defendants' motion for summary judgment against Plaintiff's Second Claim for Relief against Dr. Dhaliwal and Heintz is therefore granted.

**III. Third Claim for Relief**

Plaintiff's third claim for relief alleges mental and emotional abuse by Angus.  Plaintiff asserts there is a triable issue of fact that Angus deliberately caused him to suffer unnecessary "humiliation and mental distress" and verbally harassed and threatened him when she came to visit him at Legacy.  Plaintiff contends Angus knew he was in a vulnerable state due to his injury and was under the influence of narcotics.  Plaintiff also argues that despite Angus's knowledge that he was vulnerable, she nonetheless verbally berated him and used "aggressive" language when speaking to him.  Plaintiff asserts Angus's actions under these circumstances is sufficiently egregious to create a triable issue of fact that Angus violated his Eighth Amendment rights, citing Somers v. Thurman, 109 F.3d 614, 622 (9th Cir. 1997) in support of his proposition.

Defendants contend Angus's verbal harassment is not actionable.  They contend that to establish deliberate indifference under the Eighth Amendment, Plaintiff must show Angus's actions were calculated to cause psychological harm and that Angus in fact suffered psychological damage.  Defendants further contend Plaintiff must show that Angus was "subjectively aware of the risk" and had a "sufficiently culpable state of mind" and was otherwise deliberately indifferent to Plaintiff's health and safety.

I conclude that based on the record before me, Plaintiff fails to demonstrate Angus's alleged actions create a triable issue of fact that Angus acted with deliberate indifference.  Here, Plaintiff relies on a select portion of his declaration stating that Angus "yelled" at him about "something [he] had supposedly said to a nurse".  Brand Decl., ¶ 13.  Plaintiff also relies on his

own statement in his declaration stating Angus's "manner was very aggressive and threatening."
Id.  The actions alleged by Plaintiff are simply not objectively harmful enough to establish a
constitutional violation.  See Somers, 109 F.3d at 622 ("We are mindful of the realities of prison
life, and while we do not approve, we are 'fully aware that the exchange of verbal insults
between inmates and guards is a constant, daily ritual observed in this nation's prisons.'")
(citation omitted); see also Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996) (concluding that
"verbal harassment", including "disrespectful and assaultive comments", generally does not
violate the Eighth Amendment).  In addition, Plaintiff presents no evidence whatsoever that
Angus's alleged comments were calculated to or in fact caused him any psychological damage.
For the foregoing reasons, summary judgment against Plaintiff's Third Claim for Relief against
Angus is granted.  See Jackson v. Foster, 372 Fed. Appx. 770, 771 (9th Cir. 2010) (nurse's
"verbal harassment of [plaintiff] did not in itself constitute a constitutional deprivation") (citation
omitted).

**IV. Failure to State a Claim for Relief**

Defendants seek to dismiss claims alleged in Plaintiff's First and Third Claims for Relief
for failure to state a claim under Rule 12(b)(6).  Specifically, Defendants seek to dismiss
Plaintiff's allegations that Defendants prematurely re-assigned him to work detail before he had
been medically cleared him to work and deliberately assigned him to "kitchen jobs that were
particularly dangerous and inappropriate" in light of the fact that he was still in the process of
recovering from his injuries.  Compl., ¶¶ 71(g), 86(d).  Defendants also seek to dismiss
Plaintiff's allegation in his Third Claim for Relief alleging Defendants violated his Eighth
Amendment right to "humane conditions of confinement by keeping him in complete isolation
and refusing to allow him any visitors during his hospitalization".  Id., ¶ 86(b).  Defendants

argue Plaintiff's claims fail because he does not allege that his working in the kitchen caused him any particular injury or even exacerbated his injuries, and fails to allege this work endangered his health.  Plaintiff does not respond in any way to Defendants' arguments.

I conclude Plaintiff's allegations concerning his denial of visitation privileges simply are not actionable under the Eighth Amendment.  See Keenan, 83 F.3d at 1092 ("[T]here is no constitutional right to 'access to a particular visitor.'") (Citation omitted).  I also conclude that Plaintiff's First and Third Claims for Relief fail because they do not allege any injury caused from work Plaintiff performed after his injury.  Accordingly, Defendants' motion to dismiss Plaintiff's allegations in his First and Third Claims for Relief is granted.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss (doc. #45) is GRANTED and Defendants' motion for summary judgment (doc. #45) is GRANTED.  Because I do not consider the Childress Declaration or Exhibit 1 attached to the Childress Declaration, Plaintiff's motion to strike (doc. #73) is DENIED as moot.  Oral argument is unnecessary.

IT IS SO ORDERED.

Dated this  11th  day of  June      , 2012.


/s/ Marco A. Hernandez
MARCO A. HERNANDEZ
United States District Judge

25 - OPINION & ORDER